A0 91 (Rev. 10/03) Criminal Complaint

# UNITED STATES DISTRICT COURT

**SOUTHERN**      DISTRICT OF      **TEXAS**

United States Courts
Southern District of Texas
FILED

Nov 13, 2005

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA
V.
1. Walter Alexander Corea, 2. Maximino Mondragon, 3. Victor Omar Lopez, 4. Oscar Mondragon, 5. Kerin Silva, 6. Olga Mondragon, 7. Maria Fuentes, and FNU "Comadre" LNU

**CRIMINAL COMPLAINT**

Case Number: H-05-890M

(Name and Address of Defendant)

I, the undersigned complainant, state that the following is true and correct to the best of my knowledge and belief. On or about _December 2002_ in _Harris_ County, in
(Date)

the Southern District of Texas defendant(s) did,

*(Track Statutory Language of Offense)*

together and with others, did knowingly and intentionally conspire, combine, confederate and agree, to commit offenses against the United States; that is: to, in and affecting interstate commerce, recruit, entice, harbor, transport, provide and obtain by any means young Central and South American women and girls, and benefit, financially and by receiving a thing of value, from participation in a venture which engaged in such acts, knowing that force, fraud and coercion, as defined in Title 18, United States Code, Sections 1591(c)(2)(A) and (B), would be used to cause said females to engage in commercial sex acts contrary to Title 18, United States Code, Section 1591(a).

in violation of Title   _18_   United States Code, Section(s)   _371_  .

I further state that I am a(n) _Special Agent/ICE_ and that this complaint is based on the
Official Title

facts related in the affidavit attached hereto and made a part of this complaint.

_Lina G. Castillo_
Signature of Complainant

Lina A. Castillo
Printed Name of Complainant

Sworn to before me and signed in my presence, and I find probable cause

_November 13, 2005 @ 1:40 PM_     at     _Houston, Texas_
Date                              City and State

_Calvin Botley, United States Magistrate Judge_
Name and Title of Judicial Officer

_Cal Botley_
Signature of Judicial Officer

**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Lina A. Castillo, being duly sworn according to law, depose and say:

1. That I am a Special Agent with the United States Immigration and Customs Enforcement (ICE) and have been employed as such with ICE since October 2001. During the course of my career, I have utilized numerous different investigative techniques to pursue alien smuggling and human trafficking type investigations, including, but not limited to electronic surveillance, visual surveillance, general questioning of witnesses, the use of search warrants, the use of grand jury subpoenas, the use of confidential informants, the use of pen register/trap and trace devices, and the use of undercover agents. I have specialized knowledge of immigration laws, alien smuggling and human trafficking methods perpetrated to circumvent those laws. I have gained this knowledge as a result of both professional training and the professional experience described above.

2. Your Affiant has been personally involved in an investigation, which has several confidential informants, numerous witnesses, and two ICE agents dealing with the targets of the investigation in an undercover capacity. Your affiant is familiar with the circumstances of the offenses described in this Affidavit. On the basis of this direct participation and through the participation of other agents, Affiant states the following facts:

## FACTS AND CIRCUMSTANCES

3. It has been my experience, and the experience of other Agents with whom I have worked, that there exist a number of small bars, nightclubs, and after-hours clubs, in Houston, that employ young primarily Hispanic smuggled aliens to work as waitresses. Many of these female smuggled aliens are told that they will work selling alcoholic beverages to men in these clubs. However, in practice, they are ultimately coerced, threatened, or otherwise forced to work as prostitutes in these businesses until their smuggling fees are paid-off. Typically, the smuggling fees for these individuals are initially paid by the bar owners/operators, and therefore the smuggled females are indebted to them.

4.   It has also been my experience, and the experience of other Agents with whom I have worked, that these females are often brought to the United States under false pretenses and not told that they will have to work in bars serving drinks and acting as prostitutes until their smuggling fees are paid. Once indebted and bound to the bar owners/operators, these smuggled aliens are considered to be "victims of severe forms of trafficking," under the Victim Witness Protection Act and the Trafficking Victim Witness Protection Act of 2000.

5.   On November 8, 2004, a Confidential Informant (CI) hereinafter referred to as CI-1, provided information to ICE South Central Field Intelligence Unit (ICE/SCFIU) Analyst Frank Ortiz.  CI-1 stated that an individual known to him only as "Walter," was smuggling aliens to work in Walter's bar identified by CI-1 as "EL CUCO."  CI-1 further provided addresses, telephone numbers, and directions to "Walter's" bar and residence.  ICE/SCFIU records checks indicated that the owner, resident, and subscriber to the business, residence, and phone numbers was **WALTER ALEXANDER COREA**.  On December 15, 2004, Affiant personally interviewed CI-1.  CI-1 stated that the basis of his knowledge was through discussions with another individual.

6.   Affiant subsequently located the individual who originally provided CI-1 with the information described previously and interviewed the individual, hereafter referred to as SA886-HO.  SA886-HO corroborated CI-1's information.  During and after this interview, SA886-HO provided detailed information which was independently verified, as detailed below, during the course of the investigation.  CI-1 and SA886-HO independently stated that **COREA** was known to smuggle aliens from El Salvador, Guatemala, and Honduras into the United States through the Texas-Mexico border.  **COREA** would charge the smuggled aliens fees of $6,000 each for transportation from their native country to the Houston, Texas area, and other cities further north.  **COREA** was also known to use various types of vehicles to transport the smuggled aliens from the border area further north.  SA886-HO identified two of the drivers employed by **COREA** to smuggle aliens as "Goofy" and "Chimino."  **COREA** would also smuggle young female aliens into the United States and force them to work in his bar as prostitutes.

7.   Affiant does believe that the information provided by CI-1 and SA886-HO concerning this smuggling organization is credible, reliable, and truthful, because much of the

information provided has been independently verified.

8.  Affiant met with Houston, Texas FBI Agents in April 2005 and learned that they had conducted interviews with smuggled illegal aliens, who had been brought into the United States (U.S.) by the Walter **COREA** alien smuggling/human trafficking organization.  Based on the investigation, it was determined that the females were trafficked to the U.S. for the purpose of working as prostitutes in bars owned and operated by the organization.

9.  Further information was acquired indicating that Deputy Constables, acting in an undercover capacity, had entered some of the locations in an attempt to gather information. TABC agents had conducted inspections on some of the target locations as well.

10.  On June 24, 2004, Deputy Constables from Precincts One and Five, Harris County, acting in undercover capacities as bar patrons, entered the **EL POTRERO BAR**, owned by **MAXIMINO MONDRAGON**.  While at the **EL POTRERO BAR**, the UCA's were approached by a female who identified herself as "BLANCA." BLANCA told the UCA's she was 20 years old and originally from El Salvador. BLANCA told the UCA's she was in the United States illegally, and that she owed a man named **"Walter,"** $14,000 for bringing her to the United States. BLANCA also told UCA's that as soon as she paid off her smuggling fee debt to **"Walter,"** she was going to ask him to make arrangements to have her son brought to the United States.

11.  On January 25, 2005, TABC Agents Ben Giese and Wayne Poole conducted an inspection of the **EL POTRERO DE CHIMINO** and the Wagon Wheel Restaurant.  **MARIA A. FUENTES**, who provided her address as 7819 Shady Arbor Lane; Houston, Texas, and home telephone number as (832) 372-6496, stated she was **MONDRAGON'S** wife.  The TABC Agents also encountered **OSCAR MONDRAGON**, who was identified as **FUENTES'** brother-in-law. While conducting their inspection, Agents Giese and Poole observed several females, and at least one male, hurriedly exiting the bar through a gate in a fence at the back of the property.  **FUENTES** told the TABC Agents that the gate was part of another property, and not connected to **EL POTRERO DE CHIMINO**.

12.  **FUENTES** also told the TABC Agents that **EL POTRERO DE CHIMINO** only employed four people to include herself and her husband, and that the females that had been observed leaving

did not work for the business.  A revolver was found in the
office area of the bar, along with an airline e-ticket
receipt indicating that **MONDRAGON** had traveled from Houston
to El Salvador on January 24, 2005, and was scheduled to
return on January 28, 2005.  Various notebooks and other
papers were located at both, **EL POTRERO DE CHIMINO** and the
Wagon Wheel Restaurant, subsequently renamed **MARGARITAS
Restaurant.**

13.  While conducting their inspection, two females, who provided
identification indicating their names were Teresa Martin,
and Maria Isabel Morales, were encountered.  Martin and
Morales were cooks at the Wagon Wheel Restaurant.  A third
female, identified as Roxana Larissa RAMOS-Gomez
DOB/10311979, was also identified as being inside the Wagon
Wheel Restaurant at the time of the inspection.  RAMOS-Gomez
presented a Honduran Identification Document.

14.  On February 1, 2005, and again on June 20, 2005, FBI Agents
interviewed MAL.  MAL stated that LL originally made the
smuggling arrangements with "**CHIMINO**", subsequently
identified as **MAXIMINO MONDRAGON,** owner and operator of **EL
POTRERO BAR.**  When LL first contacted **MONDRAGON** through an
unidentified male friend in Honduras, **MONDRAGON** asked LL
about her and MAL's body types, ages, and how they looked.
**MONDRAGON** stated that the smuggling fee would be $8,000
each, which they would be required to repay by working for
him and no one else once they arrived. **MONDRAGON** further
told LL that she and MAL could make enough money to pay off
their smuggling fee debts, and send some money back to
relatives in Honduras.

15.  MAL and LL left Honduras together and traveled to Guatemala
where they met with three unidentified males acting as
guides. These guides took MAL and LL's identification
documents from them, boarded them onto a boat and
transported them by sea up the Gulf of Mexico to an area
near the Texas-Mexico border.  MAL recalled that the boat
had approximately twenty passengers, with fifteen males and
at least five females.  The smuggled males were going to be
crossed into the United States at which time their
respondents would pay their fees.  Along the way, MAL and LL
were warned by the three guides that they had to be careful
not to get caught by immigration officials and that their
identification papers were taken to prevent them from being
identified as Hondurans. MAL and LL were further instructed
that if they were caught at sea they needed to assert that
they were from Mexico.  MAL recalled that during the trip,

some of the men on the boat talked about how much money a person named "Walter" was going to pay them for bringing the women to the United States. "Walter" was subsequently identified as **WALTER ALEXANDER COREA**, owner and operator of the **EL CUCO** restaurant.

16. MAL stated that they illegally entered the United States on or about December 31, 2002 by crossing the land border with Mexico into South Texas, where MAL and LL were held in a drop-house at or near Donna, Texas.  There, the alien smugglers who had transported MAL and LL disposed of the Honduran Identification documents.  MAL further stated that while at the drop-house in Donna, **COREA** made arrangements for them to be transported to a motel, where they spent a day before being transported to Houston.  Once MAL and LL left the hotel, another pair of females would leave the house in Donna, and the cycle would be repeated.

17. MAL explained that the smuggled females were provided with identification cards she believed were legitimate immigration documents issued by the Immigration and Naturalization Service (INS) [Note: At that time, the name of the benefits department of the INS had not yet changed to Citizenship and Immigration Services (CIS)].  MAL believed these documents were valid documents that were really issued to other legal resident aliens, but procured by **MAXIMINO MONDRAGON** and **Walter Alexander COREA** and loaned to smuggled aliens who resembled the actual beneficiaries who had originally been issued these documents.  These documents were presented to immigration officials at the border checkpoints.  MAL stated that other drivers would transport them from South Texas to Houston. Subsequently MAL identified "El Culon", identified as **BENEDICTO EMILIO CAMPOS** as an employee of **COREA'S** and as the person who smuggled her and others from Donna TX to Houston.  "El Corupto", identified as **CESAR CONCEPCION ARGUETTA**, was identified as another employee of **COREA'S** who was in charge of delivering the smuggled aliens to **COREA** once they arrived in Houston.

18. When MAL and LL arrived in Houston, they were first taken to what MAL believed was **COREA'S** house. The following day, **MONDRAGON** picked them up, told them that he would get them an apartment, and assigned another female to take them shopping for clothes.  MAL and LL were told that the dress code was short or mini-skirts and low cut tops.  MAL protested to the female who had taken them shopping, and was told that **MONDRAGON** required the girls working for him to dress in this fashion.  MAL and LL then went to work at the

EL POTRERO BAR which they stated was owned by MONDRAGON.
After a few days of staying in an apartment on Pinemont,
MONDRAGON rented an apartment at the Quail Creek Apartments
for MAL and three other females.

19. On November 8, 2005, MAL revealed to Affiant that when they
first arrived at COREA'S house, they were met by his wife,
"Rosie", identified as ROSA ELVA GUERRERO. According to MAL,
GUERRERO fed MAL and other smuggled aliens who arrived and
asked them how their journey had been on the road. GUERRERO
also instructed MAL and the others to wash their clothes.

20. MAL recalled that when MAL and LL first arrived in Houston,
MONDRAGON gave them some money to send back to Honduras, but
after that their treatment changed. The smuggled aliens
were told that the original $8,000 smuggling fee had been
raised to $13,000. MAL stated that the girls were put to
work in EL POTRERO bar. Their work in the bar consisted of
drinking beers purchased for them by male patrons of the
bar. Male customers at the bar would pay $13.00 for each
beer purchased on behalf of the females. Of the $13.00, the
females would be given a ticket which was worth $9.00 in
credit. At the end of each night shift, the tickets would
be tallied and each female would be given a receipt
indicating how much money they earned for the night. At the
end of the week, the receipts would be totaled up, and the
females paid. MAL stated that from her earnings, she was
assessed a fee for food, housing, clothing, smuggling debt,
and other miscellaneous items. MAL estimated that she made
anywhere from $500 to $600 per week, but that after these
fees were assessed she would only earn around $50.00 per
week. MAL asked MONDRAGON how MAL was expected to live off
that salary, and was told that she and the others needed to
get the male bar patrons to feed them.

21. MAL and the other smuggled females were encouraged to
prostitute themselves, and those that did engage in
prostitution would exit the bar through a rear door with the
male patrons who wanted to have sex with them. They would
then go to a motel, or have sex with the male patrons in
their cars and ultimately be returned back to the bar. MAL
stated that MONDRAGON once fondled her in his office and
encouraged MAL to "loosen up" with the male bar patrons.

22. MAL stated that the younger females, to include under age
females, were forced into having sex with patrons through
intimidation. At times, MONDRAGON would offer under age
females, for sex, to business associates and/or special

clients. MAL further stated that she believed there were underage females working in the bar because MAL heard **VICTOR OMAR LOPEZ, MONDRAGON'S** brother make comments to the effect that "Oh, this one is a minor."

23.  MAL stated that **MONDRAGON** had obtained birth control shots from El Salvador, and that he would then sell these contraceptives to the female smuggled aliens for $25.00 per shot. Each shot lasted for a month. MAL confirmed that she had purchased a birth control shot once.

24.  MAL also stated that **MONDRAGON** abuses the female workers verbally in front of the others so that all would be aware of what might happen to them if they did not follow his commands. MAL recounted an incident involving one female who quit working at the bar after only eight days. **MAXIMINO MONDRAGON** made the comment in front of all of his female workers that he was going to have her house burned down.

25.  The female workers were also coached by **MONDRAGON** as to how they should respond to questions posed by law enforcement officers. The women were told not to mention his name to any law enforcement or immigration officials. **MONDRAGON** further instructed them to tell authorities that they were in the U.S. voluntarily. MAL stated that the workers at the bar know in advance of any police "raids," and when they found out about them, **MONDRAGON** would have the women hide in large dumpsters behind the bar where they would not be found.

26.  MAL stated that during MAL's employment for **MONDRAGON,** he decided to move the **EL POTRERO** from 8104 West Tidwell to a new location at 12026 Hempstead Highway. The bar was renamed **EL POTRERO DE CHIMINO,** and **MAXIMINO MONDRAGON** took several of the older female employees with him to work in his new bar, while he left the younger females with his brother, **VICTOR OMAR LOPEZ,** who renamed the bar located at 8104 West Tidwell as the **MI CABANA BAR. Victor Omar LOPEZ** took over operations at the **MI CABANA BAR.**

27.  MAL once considered leaving **MONDRAGON'S** employ to work at another bar and when **MONDRAGON** found out about MAL's intentions through "**LA COMADRE**," he traveled to Honduras and located MAL'S children that MAL had left behind. **MONDRAGON** did not confront MAL about leaving, but did tell MAL he knew where her children lived, gave MAL a description of the residence the children lived in and described the family at that address. MAL asked **MONDRAGON** how he knew about MAL'S

family, and why he had traveled to Honduras. **MONDRAGON**
replied that he wanted to make sure the little "kiddies"
would be taken care of. MAL took **MONDRAGON'S** statements as
a threat, and decided not to leave at that time.

28. MAL reported that **MONDRAGON** would tell the new females that
he was going to get their families and hold them until they
paid off their smuggling debt. MAL recalled one instance in
which a female, identified as "B", was brought over with a
friend. However, the friend ran away, and "B" was made to
pay back her smuggling fee and that of her friend, totaling
$16,000.

29. On November 8, 2005, MAL revealed to Affiant that "Maria",
identified as **MARIA FUENTES**, was in charge of the money and
bookkeeper for the debts owed by the females. According to
MAL, **FUENTES** would keep track of the balance for the
smuggling debts, loans issued, clothing costs, and would
keep track of the "tickets" earned by the females at **EL
POTRERO DE CHIMINO** bar. **FUENTES** would also take the smuggled
females to the store to purchase clothing. Furthermore MAL
indicated that MAL had seen **SAUL CRUZ**, a friend of **MAXIMINO
MONDRAGON**, frequented the **EL POTRERO DE CHIMINO** bar and had
installed the security camera equipment which is located in
**MAXIMINO MONDRAGON'S** office at the bar. MAL further
identified **CRUZ** as the co-owner of **EL HUETAMO BAR**.
Subsequently, a photo lineup of members of the **COREA**
organization was shown to MAL, and MAL identified the
following: **WALTER COREA, MAXIMINO MONDRAGON, KERIN SILVA,
ROSA E. GUERRERO, MARIA FUENTES, SAUL CRUZ, OSCAR MONDRAGON,
VICTOR OMAR LOPEZ,** and **OLGA MONDRAGON**.

30. After paying off her smuggling fee, MAL left **EL POTRERO**.
MAL told **MONDRAGON** that she knew she had paid off her
$13,000 smuggling fee because she kept track of her
earnings, however, **MONDRAGON** kept his own ledgers reflecting
the debts and smuggling fee balances owed for each of his
employees. MAL stated that during the time she worked at **EL
POTRERO DE CHIMINO** at least 25 women had been brought to
work at the bar. MAL estimated that at least three to four
new women would be brought into the bar quarterly. MAL
stated that she had also seen Western Union receipts in the
bar, but did not know any of the senders or payees names
listed on them. MAL also stated that she had seen various
weapons in the bar, and that she believed they belonged to
**MONDRAGON, LOPEZ,** and **COREA**.

31. When asked if knew what she would be doing for **MONDRAGON** for

employment in return for being smuggled to the United
States, MAL stated that the smuggled females were told they
would be working in a restaurant.

32. During the February 1, 2005 interview, MAL stated that she
had recently overheard **LOPEZ** speaking with others at the bar
about a raid on **EL POTRERO DE CHIMINO** during which time some
ledgers were taken.   **LOPEZ** was overheard stating that if the
police had gone "through the door of the prostitution house"
then **MONDRAGON** would have been "messed up real bad."

33. MAL also reported that **MONDRAGON'S** brother had arrived in
the United States around January 1, 2005.   MAL believed
**MONDRAGON'S** brother was named "OSCAR", subsequently
identified as **OSCAR MONDRAGON**, **MAXIMINO MONDRAGON'S** brother,
and that "OSCAR" and his wife supposed to run a new
bar.   MAL confirmed that OSCAR was living at **MONDRAGON'S**
residence, which MAL identified through photos as 5830 Burr
Oak in Houston, Texas.

34. On April 1, 2005, FBI Agents in Houston interviewed SA906-
HO.   SA906-HO stated that **MAXIMINO MONDRAGON** owned two
houses in Houston.   One house was located near Hollister
where **MONDRAGON** lived with his paramour, who SA906-HO
identified as **MARIA FUENTES**.   The second property was
located at 5830 Burr Oak in Houston, Texas.   SA906-HO stated
that **MONDRAGON** utilized this property as a location to
harbor the female smuggled aliens that worked in his bar.
SA906-HO further stated that **MONDRAGON** and **FUENTES** owned and
operated the **EL POTRERO DE CHIMINO** and the Wagon Wheel
Restaurant, subsequently renamed **MARGARITAS**, located on
Hempstead Highway in Houston, Texas.

35. SA906-HO stated that the females working at **EL POTRERO DE
CHIMINO** were forced into prostitution by **MONDRAGON**.
Furthermore, **MONDRAGON** gave some of the females to his
friends and business associates for sex.   If the girls
refused to go with one of his friends, **MONDRAGON** would tell
them they were just going to go riding around town.   If they
still refused, **MONDRAGON** would threaten them and their
families.   SA906-HO personally witnessed **MONDRAGON** grabbing
some of the females by their arms and dragging them to his
friends in order to force them to comply with his requests.
SA906-HO stated that the women would usually comply with
**MONDRAGON'S** instructions because they believed he would
follow through on his threats to harm their families.

36. SA906-HO stated that even when their smuggling debts had

been paid off, many of the women working for **MONDRAGON** were expected to continue having sex with **MONDRAGON'S** friends. If they refused to comply, they were told they could not work at the bar the following week.  This resulted in lost income for the females, thus forcing the females to comply with **MONDRAGON'S** instructions as they had become accustomed to the work and needed the money.

37.  SA906-HO stated that he knew **MONDRAGON** was involved with **COREA** and **LOPEZ** in bringing women to the U.S., and putting them to work in their bars because he had personally discussed these illegal activities with all three of them while at their bars.

38.  On May 19, 2005, ICE UCA GERARDO MIRANDA met with an organizational member, hereinafter referred to as CI-2 in Houston, Texas.  CI-2 spoke with UCA MIRANDA, who was posing as an alien smuggler and proposed to work as a "load driver" for the **WALTER COREA** alien smuggling/human trafficking organization.  CI-2 stated that business, referring to the alien smuggling business, was slow and the pay was minimal. CI-2 told UCA MIRANDA that the rate of payment for the transportation of illegal aliens from Houston to other states was around $250 per alien, and that sometimes there were only two to three persons to transport. CI-2 lamented that when you took into account the cost of fuel, food, lodging, and vehicle expenses, profit was minimal if any profit was made at all.

39.  CI-2 told UCA MIRANDA that he had transported illegal aliens form Houston to other states in the past, but claimed the last time he had done so was several months ago.  UCA MIRANDA asked CI-2 his technique for getting aliens through immigration checkpoints after entering the United States, and CI-2 stated that the aliens were walked around the checkpoints to the place where the drivers would pick them up on the other side.

40.  CI-2 also told UCA MIRANDA that he knew his boss as "Walter", referring to **WALTER COREA**, and would talk to him on the telephone.  CI-2 stated that his boss would tell him when and where to pick-up smuggling loads.  UCA MIRANDA asked CI-2 to contact him if he needed any loads transported.

41.  On June 5, 2005, CI-3, acting in an undercover capacity, met with **LOPEZ** and **OSCAR MONDRAGON** at the **MI CABANA BAR** located at 8104-A West Tidwell in Houston, Texas.  CI-3 told **LOPEZ**

and **OSCAR MONDRAGON** that he was opening a bar soon, and in need of female workers to staff the bar.  During this meeting, CI-3 negotiated the purchase of two female smuggled aliens to work in his bar.  **LOPEZ** and **OSCAR MONDRAGON** agreed to sell CI-3 two females for $11,000 total, with a deposit of $3,000 to be paid in advance, and the $8,000 to be paid upon delivery of the females.

42.  CI-3 learned that one of the females, a 19 year-old from El Salvador, was currently in the United States illegally, and working at the **MI CABANA BAR** and the **EL HUETAMO BAR**.  The second female was scheduled to arrive from El Salvador on or about June 15, 2005.

43.  On June 7, 2005, CI-3 met with **LOPEZ** and **OSCAR MONDRAGON** and paid **OSCAR MONDRAGON** the $3,000 deposit for the 17 year-old, and 19 year-old females they had originally discussed the purchase of on June 5, 2005.  CI-3 paid the $3,000 deposit to **OSCAR MONDRAGON** in the presence of **LOPEZ**.

44.  On June 13, 2005, ICE UCA SANTANA met with **COREA** at the **EL CUCO** Restaurant located at 8102 West Tidwell, Houston, TX.  UCA SANTANA had been introduced to **COREA** by SA906-HO. After a casual conversation, **COREA** told UCA SANTANA that he was in the business of smuggling aliens into the United States, and that business was good.  **COREA** bragged to UCA SANTANA that he had purchased numerous properties, and was planning to purchase several more, to include "CHIMINO'S", identified as **MAXIMINO MONDRAGON**, house.  **COREA** told UCA SANTANA that he charged between $6,000 and $6,500 as a smuggling fee for transporting aliens to the United States.  **COREA** stated that he was leaving for Los Angeles the following week, and that he would be out of town for about a week.

45.  During the course of the June 13, 2005, meeting, UCA SANTANA observed **COREA** answering his cell phone several times.  UCA SANTANA has made multiple calls to **COREA** at 281-788-1714, and **COREA** has answered the phone each time.  During **COREA'S** cell phone conversations that took place during his meeting with UCA SANTANA, he was overheard speaking about "packages," and buying residences so that he could house the women he smuggled in to work for him.  **COREA** also discussed having sex with the females he brought in to work in his bar over his cellular phone in front of UCA SANTANA.  Affiant believes the word "packages" is a code word that refers to smuggled aliens.

46.  On June 23, 2005, CI-3 met with **OSCAR MONDRAGON** at the **MI**

**CABANA SPORTS BAR**, located at 8104 W. Tidwell, Houston, TX in order to receive the two smuggled females he had negotiated the purchase of on June 7, 2005. Once CI-3 was away from **MONDRAGON**, CI-3 spoke with the smuggled females. One, identified as ECC, stated that she had been told that she would be working as a waitress in a bar upon entering the United States. ECC stated that she had also been smuggled in a tractor-trailer, and at one point the driver of the tractor abandoned her and the other migrants in the load while sealed in the back of the trailer. ECC and her companions were able to escape through an air vent in the trailer.

47.  ECC told CI-3 that she had been smuggled into the U.S. by **COREA**. ECC stated that she had been told by **COREA'S** son, identified as **KERIN SILVA**, that fifteen of **COREA'S** aliens who had been traveling aboard a boat had capsized and drowned. ECC further stated that **COREA** also raped some of the smuggled females prior to their being placed to work in his establishments.

48.  ECC also told CI-3 that upon her arrival in the U.S., she was arrested by immigration officials. ECC explained that she believed that once a person was apprehended by immigration officials they were issued work authorization and released. ECC stated that upon reaching Houston, **OSCAR MONDRAGON** took her work authorization, and told her that she was not going to court. Affiant believes the "work authorization" referred to by ECC refers to a Notice to Appear (NTA), and "court" refers to immigration court.

49.  On June 24, 2005, ECC told FBI Special Agent Suzanne Bradley and Harris County Sheriff's Deputy Edwin Chapuseaux that she had originally been approached in El Salvador by **OSCAR MONDRAGON**. **OSCAR MONDRAGON** told ECC that ECC could make at least $500 a week working for him in his restaurant in the United States, and that ECC could pay him for her passage once ECC was in the United States. **OSCAR MONDRAGON** did not tell ECC what the smuggling fee would be until after arrival in the U.S. ECC then learned that she owed **OSCAR MONDRAGON** $9,000.

50.  ECC stated that they traveled to the U.S. through Guatemala, after being contacted by associates of **OSCAR MONDRAGON**. ECC entered the United States illegally by crossing the Rio Grande, and turned herself into Border Patrol Agents. She was issued an NTA, and called **OSCAR MONDRAGON**. A query of the immigration database confirmed that ECC had been

apprehended by McAllen Border Patrol near Madero, TX on March 31, 2005 and subsequently released with a Notice to Appear. **OSCAR MONDRAGON** instructed ECC to call a person named "Walter", subsequently identified as **WALTER COREA,** owner and operator of **EL CUCO** restaurant. In turn, "Walter" sent his son, who she knew as "Kerin," and who Affiant believes to be organizational member **KERIN SILVA,** to pick-up ECC and four other girls that had also been apprehended by immigration authorities. ECC stated that while some of the females were destined to work for **OSCAR MONDRAGON** or **COREA,** at least one was released upon payment of her smuggling fee to her family in California.

51.  **SILVA** paid for bus fare for all four of the females traveling to Houston and put them on the bus. **SILVA** subsequently met the women upon their arrival at the bus station in Houston and took them to **OSCAR MONDRAGON'S** apartment in Houston, which ECC indicated was Somerset Apartments, #509.

52.  ECC met several other females that were living at the apartment, one of them worked at the **MI CABANA BAR,** and another worked at **EL HUETAMO CLUB.** ECC went to the **EL HUETAMO CLUB,** and observed at least 15 to 20 women working there. ECC stated that these women were engaging in prostitution and working for **OLGA** and **OSCAR MONDRAGON.** ECC further stated that **OLGA** was **OSCAR MONDRAGON'S** estranged wife.

53.  According to ECC, male patrons at the **EL HUETAMO CLUB,** were required to talk to and pay **OLGA MONDRAGON** in order to take females to engage in prostitution away from the club. The customers were allowed to return the females the following day. The rate for these females was $200.00 and up. **OLGA MONDRAGON** would charge men between $400 and $500 for ECC, and the money was then subtracted from ECC's smuggling debt to **OSCAR MONDRAGON.** After paying, the customers were allowed to leave the club with the females, and would bring them back and drop them off the following day. ECC stated that she never received any of the money that the men paid from the prostitution fees ECC earned. ECC stated that when ECC asked **OSCAR MONDRAGON** for money, ECC was given between $200 and $300 to send her family. **OSCAR MONDRAGON** told ECC that the money was a loan, which ECC would have to pay back to him.

54.  ECC stated that **OSCAR MONDRAGON** paid **COREA** to bring in women, and **COREA** would then pay the alien smugglers and

guides.  ECC also told the agents that **COREA'S** son, "Kerin",
identified as **KERIN SILVA**, at one time would wait on the
U.S. side of the border, load up the girls, and drive them
to Houston, Texas.  However, **SILVA** was almost caught
smuggling aliens and no longer drove the girls.  ECC
believed that **SILVA** had likely stopped driving loads as the
women were turning themselves into the Border Patrol and
released with NTA's.

55.   ECC stated that based on her conversations with other
      females ECC had been working with in the various bars,
      **MAXIMINO MONDRAGON, OSCAR MONDRAGON,** and **LOPEZ** all utilized
      the services of **COREA** to obtain women.  ECC stated that she
      was brought in by **COREA**, and ECC knew that **COREA** had just
      supplied two women to **MAXIMINO MONDRAGON** during the
      beginning of June (2005).  ECC stated that many of the other
      women ECC had been working in the bars with all told ECC
      they had been brought in by **COREA**.

56.   Furthermore, ECC learned that **MAXIMINO MONDRAGON** had a
      reputation for mistreating the females that worked for him,
      threatening to have forced sexual relations, stealing money
      from them, and if a customer spent a lot of money in
      **MONDRAGON'S** bar, he would tell the girls with the man that
      they had to go with them (for sex), whether the customer
      asked for them or not.  ECC stated that the women were
      afraid of what would happen to them if they refuse to do
      what was asked of them.  They were also afraid that their
      families would be killed.  ECC stated that **COREA, LOPEZ,**
      **MONDRAGON,** and **OSCAR MONDRAGON** would all make threatening
      remarks about women that had left their employment.  The
      **WALTER COREA** alien smuggling / human trafficking
      organization would tell the women that still worked for them
      that they were going to kill the children and families of
      the women that left.  ECC recalled one incident in which
      **OSCAR MONDRAGON** was upset because one of the women working
      at his bar escaped.   **OSCAR MONDRAGON** stated that he let her
      go because he knew where her son lived.  ECC recalled that
      he told them "We'll kidnap the son and if she doesn't show
      up, we'll kill the baby and then go looking for the mother
      and other relatives."

57.   ECC stated that she also knew there were several underage
      girls working at all the various clubs she had worked in.
      ECC stated that **OLGA MONDRAGON** recently had several women
      brought in from El Salvador to work at **EL HUETAMO CLUB.**
      **OLGA MONDRAGON** reportedly operated the club along with **SAUL**
      **ISRAEL CRUZ.   OLGA MONDRAGON** charged the women $12,000 in

smuggling fees, and had four or five of the women living at her house.  ECC stated that **OSCAR MONDRAGON** was going to El Salvador during the week of June 27, 2005 to recruit more women.  ECC stated that she also knew that **OSCAR MONDRAGON** would utilize a cellular telephone to call **COREA** and other alien smugglers he works with.  Subsequently, a photo lineup was shown to ECC, where ECC identified the organizational members **WALTER COREA, MAXIMINO MONDRAGON, KERIN SILVA, SAUL CRUZ, OSCAR MONDRAGON, VICTOR OMAR LOPEZ**, and **OLGA MONDRAGON**.

58.  On June 24, 2005, Affiant interviewed JLOR.  JLOR stated that she was originally from El Salvador and entered the U.S. on May 26, 2005.  JLOR further stated that she met **OSCAR MONDRAGON** in El Salvador on August 20, 2004.  **OSCAR MONDRAGON** offered to pay her smuggling fee if JLOR agreed to work at his restaurant in the U.S. to pay him back.  After traveling through Guatemala and Mexico, JLOR illegally entered the United States by crossing the Rio Grande on an inner-tube.  Once in South Texas, JLOR boarded a commercial bus destined for Houston.

59.  JLOR was apprehended by Border Patrol Agents, issued an NTA, and released from custody. A query of the immigration database confirmed that JLOR had been apprehended by Border Patrol in Harlingen, TX on 6/21/2005 and subsequently released with a Notice to Appear. She then boarded another bus to Houston and called **OSCAR MONDRAGON** from the Greyhound bus station to pick her up.  **OSCAR MONDRAGON** then transported JLOR to an apartment and JLOR was taken to purchase some clothing by another female JLOR believed to be **OSCAR MONDRAGON'S** wife.  JLOR gave **OSCAR MONDRAGON** her NTA, and was told that a friend of his would be by to give JLOR a ride.

60.  JLOR admitted that she had been raped by **OSCAR MONDRAGON** on the same day that JLOR was purchased by CI-3. JLOR explained that she was taken to a room behind the bar area at **MI CABANA BAR** where there was a bed or a cot in one corner and a computer which JLOR believed was used as surveillance for different areas of the bar. JLOR stated that she tried to fight **OSCAR MONDRAGON**, but was overtaken by his strength. After **OSCAR MONDRAGON** was done with her, he told her that his brother, known by her as "Omar", subsequently identified as **VICTOR OMAR LOPEZ**, wanted a turn with her as well. Shortly, thereafter CI-3 appeared at the bar and she was able to depart the room without further incident.

61. On June 30, 2005, ICE UCA PEREZ and HCSO UC officer J. Munoz entered **EL HUETAMO BAR** located at 1810 Ojeman St., Houston, TX in an effort to gather information related to illegal prostitution involving smuggled females from South and Central America. Two females were subsequently taken into custody and identified as foreign nationals illegally present in the U.S.

62. On July 5, 2005, Affiant interviewed EMZA who stated that she first met **"OSCAR"**, identified as **OSCAR MONDRAGON**, in El Salvador in February 2005. According to EMZA, **OSCAR MONDRAGON** indicated that a relative of EMZA was going to the U.S. to work at a restaurant and earn lots of money and offered to bring EMZA as well. **OSCAR MONDRAGON** further indicated that money was not an issue.  When EMZA asked **OSCAR MONDRAGON** if that person was going to have to prostitute herself and / or strip for the money, **OSCAR MONDRAGON** stated that she would not be doing those things.

63. EMZA initially refused his offer, however, **OSCAR MONDRAGON** began to call EMZA on her cellular telephone, having acquired her phone number through a relative. **OSCAR MONDRAGON** called a total of five times until EMZA finally agreed to travel to the U.S. with **OSCAR MONDRAGON'S** assistance. The last couple of times **OSCAR MONDRAGON** called EMZA, he was already in El Salvador and EMZA that all was ready for her to travel and that there would be others traveling with her. **OSCAR MONDRAGON** instructed EMZA to travel to San Miguel where **OSCAR MONDRAGON** owns a house and where they would be preparing for their departure.  There EMZA met a relative of **OSCAR MONDRAGON** named Oscar Miguel LNU. Oscar Miguel also recruited females for work in the U.S.  On the second day, a total of eight people – seven females and one male, departed the house for travel to the U.S. on or about 5/2/2005.

64. According to EMZA, they traveled from El Salvador into Guatemala, then through Mexico and into the U.S. via the river at Hidalgo, TX.  EMZA stated that upon crossing the river in a raft onto the U.S. side, the smugglers told EMZA and the others to follow the path, which was a gravel road, until they reached the highway.  The smugglers then returned back to the Mexico side of the river. EMZA stated that upon reaching the highway, they were encountered by officers. These officers were subsequently identified as border patrol agents.  The border patrol agents processed EMZA and the others and released them all after serving them with Notices to Appear (NTA's).  A query of the immigration database

confirmed that EMZA had been apprehended by Border Patrol in Hidalgo, TX in May, 2005 and subsequently released with a Notice to Appear.

65.  The following morning, EMZA called **OSCAR MONDRAGON** and advised him that she needed money for bus fare to travel into Houston. According to EMZA, **OSCAR MONDRAGON** had made arrangements to pick her up at the bus station upon EMZA'S arrival into Houston.  **OSCAR MONDRAGON** spoke to a man who was sitting behind the ticket booth at the bus station and made arrangements to send the money via western union in the man's name.  The money was to pay for a bus ticket for EMZA and another man, possibly named Juan Carlos. According to EMZA, **OSCAR MONDRAGON** called her at the bus station and told her that he had sent $170.00, however a portion of that money would be going to the man that **OSCAR MONDRAGON** had sent the money to.

66.  EMZA and the male arrived at the Houston bus station downtown, possibly GREYHOUND BUS station, that evening and were subsequently picked up by **OSCAR MONDRAGON** and his girlfriend known only as Etelbina.  EMZA was taken to **OSCAR MONDRAGON'S** apartment, possibly called Creekwood Apartments, where he advised EMZA that she would be taken to the store to buy clothes the following day so that EMZA could go to work that evening. **OSCAR MONDRAGON** took EMZA and another female to the store the next day and told the other female to assist EMZA in buying clothes since she knew how they were to be dressed for work.  The female advised EMZA that they were to buy short shirts, short tight shirts and high heels.  Later that day, **OSCAR MONDRAGON** took the ladies to work, dropping one off at **MI CABANA BAR**, and the remaining four, including EMZA at **EL HUETAMO** also known as **EL HUETAMO NITE CLUB.**

67.  That same day, **OSCAR MONDRAGON** instructed EMZA that she would need to drink alcohol and for every drink that EMZA had with the customers while at the bar, a ticket would be given to **OLGA MONDRAGON**. Each ticket represented a beer purchased by a customer for approximately $13.00 for the accompaniment of one of the women working at the bar. Of the $13.00, $9.00 of the money was to be given to the women as a form of credit toward the debt owed for their smuggling fees. **OSCAR MONDRAGON** charged EMZA $9000.00 for her smuggling fees from El Salvador to Houston, TX. The owner of the bar, **OLGA MONDRAGON,** would approach EMZA, take her by the hand, and tell EMZA to dance with the clients. **OLGA MONDRAGON** would then instruct EMZA to sit on the clients'

laps and to be with them.  When EMZA told **OSCAR MONDRAGON** that this was not the type of work he had told EMZA she would be doing, **OSCAR MONDRAGON** told EMZA that she was here now and that she needed to work with the customers.  If a customer came to take EMZA or the other women at the bar, they were instructed to go with them outside the bar and have sexual relations with them. Furthermore, EMZA indicated that she saw several females who would leave the bar to meet with clients.

68.   According to EMZA, Mari Cruz was a girl who would later run away from the bar.  EMZA stated that it was heard that after Mari Cruz's disappearance, **OSCAR MONDRAGON** had his people in El Salvador take Mari Cruz's child from her relatives and vowed not to return the child until Mari Cruz reappeared.

69.   According to EMZA, **OSCAR MONDRAGON** made attempts to force himself on EMZA, the last incident of which was when **OSCAR MONDRAGON** entered her apartment, shared with two other females. The apartment complex was identified as Summerset Apts. **OSCAR MONDRAGON** approached EMZA in the living area of the apartment and forced himself on her attempted to have sexual relations. However, EMZA'S roommates saved EMZA and **OSCAR MONDRAGON** soon departed the apartment without incident. EMZA further stated that when she had first arrived, **OSCAR MONDRAGON** frequented **EL HUETAMO** bar where EMZA worked and forced her to dance with him while kissing and fondling her against her will.

70.   EMZA indicated that she overheard **OSCAR MONDRAGON** telling the girls he was going to sell some of the girls.  Additionally, **OSCAR MONDRAGON** was heard saying he was going to pay someone lots of money to take one of the females he had trouble with to the border and kill her.

71.   According to EMZA, the females who were smuggled for **OSCAR MONDRAGON** were charged a fee of $9000.00.  The females who were smuggled for **OLGA MONDRAGON** were charged a fee of $12,000 as well as those working for "Omar", identified as **VICTOR OMAR LOPEZ**.  While the females who were smuggled for and worked for "Chimino", identified as **MAXIMINO MONDRAGON**, were charged a fee of $15,000.

72.   According to EMZA, she has seen "Walter", identified as **WALTER COREA**, parked outside **MI CABANA** Sports Bar. EMZA identified **COREA** as the "coyote" who smuggled a relative into the U.S. from El Salvador.

73. July 21, 2005, ICE UCA SANTANA went to **EL CUCO** Restaurant after calling **COREA** at cellular telephone number 281-788-1714 to arrange a meeting.  UCA SANTANA was told by one of the female employees that **COREA** would not be in for another two hours. At this time, UCA SANTANA contacted **COREA** at 281-788-1714, where they discussed the transportation of smuggled aliens from El Salvador and Honduras directly from those countries to Houston via commercial airlines flights. **COREA** told UCA SANTANA that he knew that it was very difficult to get aliens in on direct flights at the airport. UCA SANTANA advised **COREA** that he specialized in such arrangements and charged a smuggling fee of $10,000 for his services.

74. In July 2005, the following information was obtained from TABC Agent Ben Giese. On September 14, 2004, TABC Agent Ben Giese conducted an inspection of the **EL CUCO BAR** owned and operated by **WALTER COREA**.  Agent Giese seized several ledgers from the bar.  One of the ledgers contained the name "**WALTER COREA**" on the front, and contained tabulations on several pages.  Each page listed names of females, and then an amount beside them as if it were a tabulation of money earned or owed by each girl.  Also seized along with the ledgers were Western Union receipts indicating that **COREA** had sent money to Honduras and El Salvador.  The cellular telephone number 281-788-1714 was listed on the Western Union receipts along with **COREA'S** name.

75. Further investigation conducted on the Western Union receipts have identified **KERIN SILVA** as a recipient of approximately $12,170.00 from 1/26/05 to 5/08/05 and **WALTER COREA** as a sender for approximately $15,885.00 from 3/01/05 to 5/25/05 to El Salvador, Guatemala, and Mexico.

76. On September 22, 2005, Affiant interviewed BEBC. BEBC indicated that she arrived into Houston, TX shortly after crossing the U.S./Mexico border in 2002. BEBC also stated that **WALTER COREA** was the "coyote" in charge of smuggling her and others into the Houston area. BEBC further indicated that during their travel to the U.S., they stopped at a motel in Guatemala for the night, where they had previously been instructed by **MAXIMINO MONDRAGON** to tell the owner that they came in the name of "Walter", referring to **COREA.** BEBC met **COREA** once they arrived at a house located on the U.S. side, south of the checkpoint, and south of Corpus Christi, TX. Affiant believes that this is in the general area of drop house in Donna TX, which was previously indicated by MAL in her interview.

77.  While at the house, BEBC and other females were given
     paperwork and identification cards bearing other peoples
     names and photos on them in an attempt to pass them as their
     own and cross through the checkpoint.  BEBC stated that
     **COREA** handed her the paperwork that she was to use to get
     through the checkpoint.  **COREA** also commented to her that he
     hadn't noticed how pretty she was and once they crossed the
     checkpoint, he would have his way with her at the motel. An
     elderly gentleman, known only as "el viejo" translated as
     "the old man", who was the driver of the vehicle used to
     cross the checkpoint, told BEBC not to worry. He wouldn't
     allow anything to happen to BEBC. BEBC and another female
     were picked up from the motel and driven to **El CUCO**
     restaurant in Houston, TX. They were placed in a storage
     room at the restaurant for approximately an hour before they
     were delivered by **COREA** to **MAXIMINO MONDRAGON**. BEBC stated
     that **MONDRAGON** advised her that she would be working in a
     bar as a cashier temporarily. However, once in Houston,
     **MONDRAGON** told BEBC that she would have to drink beer and be
     with clients in order to pay back her smuggling debt.

78.  On September 29 and October 5, 2005, Affiant along with
     Harris County Sheriff's Office (HCSO) Deputy Edwin
     Chapuseaux conducted further interviews of BEBC. BEBC was
     introduced to ""Chimino", identified as **MAXIMINO MONDRAGON**,
     through relatives who heard that **MONDRAGON** would bring girls
     to work in the U.S. At that time, **MONDRAGON** took BEBC TO
     obtain a passport and paid for it as well. **MONDRAGON** then
     instructed BEBC to wait until **MONDRAGON** was ready to send
     for BEBC. When BEBC asked where BEBC would live, **MONDRAGON**
     responded by telling BEBC not to worry because **MONDRAGON**
     would find an apartment for BEBC and furnish it as well. On
     or about June 2002, **MONDRAGON** instructed BEBC to go to his
     house located in the center of San Salvador, El Salvador to
     await transportation to the U.S. The house was a four (4)-
     bedroom home. Upon arrival, an older woman named Guadalupe
     met BEBC. Three other females arrived at the residence in
     the days that followed. One of the females returned for home
     having changed her mind about taking the trip. While at the
     residence, Guadalupe informed the females that **MONDRAGON** had
     called and instructed Guadalupe to send the women to the
     pharmacy in order to obtain birth control injections prior
     to their departure. The two females who had arrived went to
     receive the injections, however, BEBC refused and advised
     Guadalupe that BEBC was already receiving injections for
     birth control. A week later, a male arrived and took BEBC
     and the two other females to the local bus station. The
     unidentified male bought bus tickets to Guatemala for BEBC

and the other two females and sent them via bus with only their proper passports. The females had been instructed to leave the rest of their documents with Guadalupe at the San Salvador residence.

79. Once in Guatemala, BEBC and the others took a taxi to "El Quexalito" motel. BEBC told the person at the motel that they came in the name of "Walter", identified as WALTER COREA having been previously instructed by **MONDRAGON** to say this. At the motel, they met with others who were also traveling to the U.S. At this time all passports were taken from the people, including BEBC. They were instructed to remove the tags from all their articles of clothing and all foreign money was collected from everyone. They took a bus from the motel until they arrived at a coastal area. There they walked to a house and waited for several hours until they departed for Mexico on a boat that was big enough for fourteen (14) passengers. There were approximately twenty-one (21) people in the boat. The boat ride was approximately fourteen hours (14). Once in Mexico, they took another boat through what they called the "Dead Sea". This ride took approximately four (4) hours.

80. The journey through Mexico continued until they arrived at a two-story house in Oaxaca, Mexico where they remained for one week. BEBC believed this to be the home of one of the guides' relatives who had been guiding the group. While at the residence, they were given classes on how to appear like Mexican Nationals in order to avoid being caught by Mexican immigration officials. They were taught who the Mexican president was, the national anthem of Mexico, etc. BEBC further stated that they were told, if they were ever apprehended by immigration officials to present themselves as Mexican nationals.

81. A week later, they were separated into smaller groups and taken to get onto several buses departing Oaxaca, Mexico en route to Reynosa. BEBC'S group met up with the rest of the group at a house where they spent the next two weeks. BEBC identified some of the guides traveling with the group as "Culon", subsequently identified as **BENEDICTO CAMPOS**, "Peludo", and "El Chumelo". BEBC stated that Mexican authorities had apprehended "El Chumelo" along with five (5) other immigrants during the trip. The remaining sixteen (16) of the original twenty one (21) immigrants were then separated again into groups and BEBC was led by **BENEDICTO CAMPOS** to the river where BEBC and the others were crossed onto the U.S. side via inner tube type devices by two

guides.

82. Once they arrived on the U.S. side, they walked for approximately two (2) hours and while they were waiting for a vehicle to pick them up, U.S. Immigration officials apprehended them. While some people fled, others including BEBC and a guide named "Peludo" were apprehended. Everyone in custody claimed to be Mexican nationals, having previously been instructed to do so by the smugglers, and were voluntarily returned to Mexico. Approximately two days later, they attempted to cross the Mexico/U.S. border again, and were successful. After many hours of walking through the brush and desert area, a Hispanic male in a large pickup truck picked up the sixteen (16) immigrants. The Hispanic male was an older man, approximately 50 years old with gray hair, tall, thin, and wore a silver ring bearing a skull on his right hand. BEBC and the other immigrants were taken to a house, which BEBC believes was located south of Corpus Christi and south of the checkpoint, where they remained for approximately two days.

83. BEBC met "Walter", identified as **WALTER COREA**, at the house located south of Corpus Christi. **COREA** threatened to charge BEBC $500.00 for not keeping watch over the females. BEBC stated that **MONDRAGON** had previously instructed BEBC to maintain vigilance over the females traveling with BEBC and to ensure that they stayed away from the males. **MONDRAGON** further instructed BEBC to advise him if any of them had sexual relations with anyone during the travel. Since one of the females, ""Marlene"", had sexual relations with the smuggler, "El Conejo", **COREA** stated that BEBC had failed to do as instructed and threatened to charge BEBC a $500.00 fine, but ultimately didn't.

84. BEBC and two other females were crossed through the checkpoint with false documents provided by **WALTER COREA**. The others who couldn't pass with documents were taken to walk around the checkpoint. According to BEBC, **COREA** handed an identification card, which had another person's name and photo, to the driver taking BEBC through the checkpoint. BEBC believed they were going to attempt to pass BEBC as that person. The driver was identified as an older man called "el Viejo". However, the document was not used as the border patrol officer waived them through. That day, **COREA** also advised BEBC that he failed to notice how pretty BEBC was. BEBC indicated that BEBC had been sleeping at the house the day before when **COREA** first arrived. **COREA** further stated that he would wait for BEBC and get her at the motel.

"El Viejo" told BEBC not to worry because "El Viejo" wouldn't let anything happen to BEBC. Only three females were crossed through the checkpoint with false documents, while the rest were walked around the checkpoint with guides leading them through the brush. Family supposedly picked up the third female once she arrived at the motel before BEBC arrived.

85.  Once past the checkpoint, BEBC and "El Viejo" arrived at the motel and met up with another female who had arrived earlier. Approximately three (3) hours later, a Hispanic male described as approximately 24 years old, with short black hair, medium height and thin, picked up BEBC and another female at the motel and drove them into Houston to the **El CUCO** Restaurant.  Both BEBC and the other female, identified as "Marlene", were taken to the storage room at **EL CUCO** and remained there for approximately one (1) hour. BEBC described the storage room as a small room with a small bed for a child and storage area for alcoholic beverages.

86.  At approximately 12:30 a.m., **COREA** took BEBC next door to a room located behind the bar area in **EL POTRERO DE CHIMINO**, now occupied by **MI CABANA** Sports Bar. The room was small and contained a bed made of a plastic lawn chair type frame and a mattress on top, a bathroom, and clothes placed onto hangers, supposedly belonging to **MAXIMINO MONDRAGON**. There was a computer with security cameras maintaining watch over the parking lot area, inside of the facility, and the bar area. BEBC identified this room as **MONDRAGON'S** office. **MONDRAGON** was waiting in the room when **COREA** took BEBC over and **MONDRAGON** instructed BEBC to wait there until the bar was empty. MONDRAGON further advised BEBC that he would take BEBC and the other female to buy some clothes later that morning. At approximately 2:30 a.m., after taking a shower in another room as instructed by **MONDRAGON,** BEBC was called back to **MONDRAGON'S** office.

87.  BEBC stated once BEBC arrived in the office, MONDRAGON forced BEBC to have sexual relations with him against her will. MONDRAGON told BEBC that he was going to show BEBC how to enjoy money, and like making money no matter how it was made. BEBC indicated that BEBC felt alone, desperate, and saw no way out. BEBC further indicated that she was fearful of MONDRAGON since BEBC heard rumors that MONDRAGON beat his females, so BEBC feared that he might have done the same to her if BEBC attempted to fight him.  BEBC also stated that if BEBC had known this was to be expected of her while BEBC was in El Salvador, BEBC would never have traveled to the

U.S.

88. According to BEBC, **MONDRAGON** stated that her smuggling debt would be $8,000.00, however, **MONDRAGON** then charged BEBC an additional $4,000.00 for miscellaneous expenses such as clothing, and rent despite the fact that **MONDRAGON** only paid three months rent. **MONDRAGON** later charge BEBC an additional $4,000.00, which was half of the debt owed by another female who had run away. This brought BEBC'S total debt to $16,000.00.

89. BEBC indicated that **MONDRAGON** would only give her $50.00 weekly, and treated BEBC very badly. **MONDRAGON** verbally abused BEBC by using humiliation tactics in front of BEBC'S co-workers, insulting her and ignoring BEBC while at **EL POTRERO DE CHIMINO.**

90. Approximately three months after BEBC'S arrival into Houston, BEBC received word from **VICTOR OMAR LOPEZ** that his brother, **MONDRAGON,** sent for BEBC to clean the bar. The bar was closed, as it was a Monday, however, BEBC went to **EL POTRERO** as instructed by **LOPEZ.** Upon arrival, BEBC was met by **LOPEZ** and a male identified as the brother of "Maria", identified as **MARIA FUENTES, MONDRAGON'S** girlfriend. **LOPEZ** advised BEBC that BEBC could have as many "Corona's" as she wanted and that BEBC would receive $9.00 per beer. **LOPEZ** further advised BEBC that **MONDRAGON'S** orders were for BEBC to remain at the bar with the man and have sexual relations with him. BEBC refused, however **LOPEZ** told BEBC that if BEBC wanted **MONDRAGON** to threat her better, BEBC would do it. **LOPEZ** then gave BEBC three (3) condoms, which **LOPEZ** placed on a desk in the storage room, and told BEBC there were more if BEBC needed them and left the premises. BEBC and the male remained at the bar the rest of the afternoon until the next day (approximately 6:00 pm to 11:00 am) when **LOPEZ** returned to unlock the doors, which had been locked from the outside. BEBC indicated because the doors locked from the outside, BEBC was unable to leave the bar. Although BEBC told the male that she didn't want to have sexual relations with the male, he ignored her. BEBC stated that she ultimately gave in for fear that **MONDRAGON** might find out that BEBC had refused and he might bring harm to BEBC'S or her family.

91. In approximately January 2003, **MONDRAGON** locked BEBC in his office with another male, identified as **SAUL CRUZ.** BEBC stated that BEBC told **CRUZ** she didn't want to have sexual relations with him although **MONDRAGON** had instructed BEBC to seduce him. **CRUZ** told BEBC not to worry, and that he would

tell **MONDRAGON** that they had relations, although they
didn't. According to BEBC they remained in the room talking
for a while until they left. **SAUL CRUZ** has been identified
as part owner of **El HUETAMO BAR.**

92.   BEBC indicated that BEBC once saw a pregnant woman named
"Christina" who was sent to live with **COREA** and his
girlfriend/wife. One day, "Christina" was sent to the
**"Comadre's"** apartment. "Christina" told BEBC that she was
forced by "Chimino", identified as **MAXIMINO MONDRAGON** to
abort her baby in order to ensure that she would continue to
make money working for him to pay off her smuggling debt.
"Christina" was given eight (8) pills to take orally, by
mouth and another eight (8) pills to take anally. According
to BEBC, "Christina" was approximately five (5) to six (6)
months pregnant when this occurred. "Christina" became very
ill and the fetus was born alive as a fully formed male.
"Christina" became so ill, she almost died and the **"Comadre"**
no longer wanted her at her apartment, so she was sent to
live with BEBC and her roommates. They cared for "Christina"
nursing her back to health, while one of **COREA'S** workers
took medication (antibiotics) to "Christina" at the
apartment. According to BEBC, there were rumors that
"Christina's" baby was said to be **COREA'S** father's child.
BEBC also stated that "Christina" would ultimately return
back to work at the bar, however she was treated badly
because she failed to earn sufficient money.

93.   According to BEBC, **MONDRAGON** charged the female employees, a
$5.00 fee to use the telephone at the bar. On one occasion,
**MONDRAGON** accused BEBC of using the phone despite BEBC'S
denials and **MONDRAGON** threatened to charge BEBC a $2,500.00
fee the next time BEBC used the telephone.

94.   When BEBC was near final payment of her smuggling debt,
BEBC began to ask **MARIA FUENTES, MONDRAGON'S** girlfriend and
accountant, how much BEBC had left to pay. **FUENTES** was in
charge of collecting the tickets from the females for beers
purchased on a weekly basis, paid the girls salaries, kept a
record of their debts owed, and issued receipts to the girls
showing their balances. One day, **FUENTES** finally advised
BEBC that it was her last week. BEBC indicated that BEBC
felt that she overpaid the debt, but never said a word, for
fear of retribution from **MONDRAGON.**  Subsequently, a photo
lineup was shown to BEBC, where BEBC identified the
organizational members **WALTER COREA, MAXIMINO MONDRAGON,
KERIN SILVA, ROSA E. GUERRERO, MARIA FUENTES, SAUL CRUZ,
OSCAR MONDRAGON, VICTOR OMAR LOPEZ,** and **OLGA MONDRAGON.**

95. On October 13, 2005, Affiant and a Harris County Deputy interviewed CI-2. CI-2 stated that **WALTER COREA** is the owner of a restaurant called **El CUCO** located off Hwy 290 and Tidwell, Houston, TX. The source further stated that **COREA** brings young females, some minors, from foreign countries, mostly El Salvador and Honduras, into the U.S. to work as prostitutes in local bars. The source identified **MAXIMINO MONDRAGON** aka "**Chimino**" as the owner of a bar named **EL POTRERO DE CHIMINO**, which is located off Hempstead Hwy, Houston TX and **OMAR LOPEZ**, "**Chimino's**" brother, as the owner of a bar next to **COREA'S** restaurant called **MI CABANA**. According to CI#3, both bar owners have utilized **COREA** to smuggle females to work in their bars in the past and believes that "**Chimino**" continues to conduct business with **COREA**.

96. CI-2 indicated that **COREA** has smugglers and guides who take people from their foreign country through Guatemala, Mexico and into the U.S. Once they arrive in the U.S., **COREA** instructs the foreign nationals to turn themselves in to immigration officials in order to obtain a permission to be in the U.S. Once the foreign nationals are processed through immigration and given their papers, they are released. Affiant understands the reference to "papers" to be the Notices to Appear (NTA's). At that time, **COREA** tells them to board a Greyhound bus to Houston where they will be picked up upon arrival.

97. Once they arrive in Houston, the females are delivered to the **El CUCO** restaurant parking lot. Some of the smuggled aliens are delivered to their families in the parking lot as well. **COREA** utilizes the office phone # 713-895-9099 at **El CUCO** to conduct his smuggling business as well as several other cell phones.

98. CI-2 advised that in the past, once the smuggled aliens crossed the MX/US border, **COREA** paid someone (a driver) to take them to drop houses that were rented in Donna and Alamo, TX. Some were dropped off two (2) hours south of the checkpoints and then walked on foot while being led by a guide around the checkpoints. **COREA'S** son, **KERIN SILVA** was a driver who would pick up the smuggled aliens on the U.S. side once they crossed.

99. CI-2 further indicated that **COREA** has sexual relations with some of the smuggled females, against their will, that **COREA**

takes a liking to. The source also indicated that **COREA** has photos of the females who he smuggles into the U.S. and shows them to his best clients who take the females to buy clothes once they arrive in the U.S.

100. CI-2 stated that **COREA** and **MONDRAGON** utilized the services of a female Honduran national who reportedly conducts unlicensed abortions. CI-2 indicated that in 2003, one of the females employed at one of the bars was approximately 4-6 months pregnant and was forced to have an abortion. CI-2 further indicated that **MONDRAGON** charges the smuggled females approximately two to three thousand dollars for an abortion, however, **MONDRAGON** only pays **"Comadre"** a $300.00 fee for the abortion services. It is assumed that the fees charged to the females are added to their debt.

101. It has been my experience, and the experience of other Agents with whom I have worked, that alien smuggling organizations frequently utilized communications facilities to include cellular telephones, to facilitate their alien-smuggling activities.  Cellular telephones are used by the alien smugglers to coordinate efforts between themselves and others who play vital roles in the smuggling process to include:
- Foreign based operatives engaged in recruiting of aliens wishing to be transported to the United States;
- Guides responsible for the passage of smuggled aliens from their native countries and towns to and over the border into the United States;
- Persons responsible for bringing smuggled aliens through the ports of entries and/or border locations not authorized for lawful crossing;
- Load vehicle drivers and transporters responsible for driving smuggled aliens through and around CBP checkpoints to avoid apprehension;
- Drop-house operators who must harbor smuggled aliens until arrangements are made to transport them to their ultimate destinations, and until their smuggling fees are paid;
- Financial arrangers who are responsible for collecting smuggling fees, and conducting transactions (money laundering) to pay all parties who are owned money for the role they have undertaken in the smuggling process.

102. Pen register records for the 281-788-1714 indicate that

between June 14, 2005 through and including 11/03/2005, 2005, a total of 308 calls were conducted between **WALTER COREA** and **ROSA E. GUERRERO,** 223 calls were conducted between **WALTER COREA** and **MAXIMINO MONDRAGON,** 148 calls were conducted between **WALTER COREA** and **KERIN SILVA** aka KERIN SYLBA, 3 calls were conducted between **WALTER COREA** and **VICTOR OMAR LOPEZ.** 16 calls were conducted between **WALTER COREA** and the City of McAllen Bus Terminals, 13 calls were conducted between **WALTER COREA** and El Expresso Bus Company. This number is subscribed to by Ana C. Morales residing at 5701 Lost Forest St. #2109; Houston, Texas 77092-7092.

103. Further records acquired by Western Union indicate that **WALTER ALEXANDER COREA** has provided the cellular telephone number 281-788-1714 number as his own telephone number, at times when he has wired money in furtherance of the activities of the **WALTER COREA** alien smuggling/human trafficking organization. **COREA** has also provided the number 281-788-1714 to Undercover Agents (UCA's) posing as alien smugglers as his own personal cellular phone number and has had numerous conversations with Undercover Agents and sources on the same cellular telephone number.

104. Organizational members located in Houston, TX include **MAXIMINO MONDRAGON** aka **"Chimino",** owner and operator of the **EL POTRERO DE CHIMINO BAR. MONDRAGON** travels to El Salvador to recruit young females to work at **EL POTRERO DE CHIMINO,** while these females are smuggled in by and at the direction of **COREA. MONDRAGON** employs physical intimidation and abuse to the smuggled females to prevent them from leaving his employ before they have paid off all their smuggling debts. Estranged organization members, **OSCAR MONDRAGON and VICTOR OMAR LOPEZ, aka "OMAR",** are co-owners of the **MI CABANA SPORTS BAR.** This business was purchased from **MONDRAGON,** and the bar has employed several of the smuggled females brought in by **COREA. OSCAR MONDRAGON** travels to El Salvador to recruit young females to work at the **MI CABANA** as well.

105. **SAUL CRUZ,** and **OLGA MONDRAGON,** estranged wife of **OSCAR MONDRAGON,** are co-owners of the **EL HUETAMO BAR. CRUZ** and **OLGA MONDRAGON** also employ females brought in by **COREA. OLGA MONDRAGON** employs physical intimidation tactics and abuse to ensure that smuggled females working in the bar, engage in prostitution and repay their smuggling fees.

106. The **WALTER COREA** alien smuggling / human trafficking organization employs an individual known only as **"LA COMADRE"** to perform unlicensed abortions on demand to any of

the smuggled females who become pregnant as a result of engaging in prostitution in these bars.

107. Based upon my analysis of the information detailed within this affidavit, as well as other information learned by affiant during the course of my investigation into this matter, I have reason to believe that **WALTER COREA** is the leader of an alien smuggling / human trafficking organization operating primarily in Houston, Texas. **COREA** owns and operates the **EL CUCO**, restaurant and bar. **COREA** entices primarily young females from Central America, particularly El Salvador and Honduras, to illegally enter the United States, and then forces them to work in his bar until their smuggling fees are repaid. The smuggled females are told that they will work as "taxi" or "pony" dancers, and will sell/serve beer to men while keeping them company by talking to them. However, in practice, the organization utilizes violence, intimidation, and threats in order to force many of the smuggled aliens to engage in prostitution. The smuggled aliens eventually find themselves in situations of perpetual indentured servitude in order to repay their smuggling debts to **COREA** and his confederates.

108. **COREA** directs and employs other associates of the organization to recruit and transport aliens from Central America and Mexico to Houston, Texas, and other cities beyond Houston, Texas. **COREA** has employed CI-2, **BENEDICTO EMILIO CAMPOS,** and **CESAR CONCEPCION ARGUETTA** in the past to smuggle aliens, including females from the South Texas area to Houston, Texas and further to northern states. **COREA** has employed his son, identified as **KERIN SILVA,** to transport smuggled aliens for him and pick up smuggled females at the local bus station.

108. **COREA** also supplies female illegal aliens that he has smuggled into the United States to other bar owners. From time to time, these aliens are bought and sold from other bar owners/operators who are members of the **WALTER COREA** alien smuggling/human trafficking organization.

109. **COREA** also employs other members of the organization to ensure that any smuggled alien arrested by immigration authorities (to include ICE and Customs and Border Protection (CBP) Officers) are bonded out of government custody so that they may work in **COREA'S** establishment, or those of his associates. The smuggled aliens are forbidden from attending their scheduled immigration hearings. This is done so that they may be threatened with deportation

after being ordered deported in absentia.   In turn, these trafficking victims become even more indebted to the organization.

110. An immigration and criminal history inquiry revealed that **WALTER COREA**, who is a native of El Salvador, was deported in 2003 by U.S. Immigration and Customs Enforcement (ICE) due to multiple criminal convictions and is considered a previously deported aggravated felon. **COREA'S** criminal history shows an arrest by Los Angeles Police Department (LAPD) on 4/27/1989 for grand theft auto and receiving known stolen property, an arrest by LAPD on 8/2/1995 for burglary. COREA is also known to use many aliases to avoid positive identification as possible deportation by immigration officials. In the past, **COREA** attempted to pass himself as a Mexican national, and utilized the name of Gerardo Loza GARCIA.

111. Your Affiant believes that based upon the statements made by **COREA,** members of the organization, victims of the organization, and witnesses to confidential informants and ICE agents, acting in an undercover capacity from February 2005 to present, monitored and recorded conversations and telephone calls made to **COREA** and organizational members, as well as interviews of victims of the organization, that there exists probable cause to believe that **WALTER ALEXANDER COREA, MAXIMINO MONDRAGON, VICTOR OMAR LOPEZ, OSCAR MONDRAGON, OLGA MONDRAGON, KERIN SILVA, MARIA FUENTES, FNU "COMADRE" LNU,** and others yet unknown have committed the following offenses: Title 8, United States Code, Section 1328; Importation of any alien for the purpose of prostitution or any other immoral purpose; or the holding of any alien for any such purpose in pursuance of such illegal importation; or the keeping, maintaining, control, support, employ, or harboring of such alien in any house or other place, for the purpose of prostitution or for any other immoral purpose, Title 18, United States Code, Section 1581; Peonage; obstructing enforcement; Holding any person to a condition of peonage, or arresting any person with the intent of placing him in or returning him to a condition of peonage, Title 18, United States Code, Section 1583; Enticement into slavery, carrying away any person with the intent of selling such other person into involuntary servitude, or held as a slave; or persuading, or inducing any other person to go on board any vessel or to any other place with the intent that he may be made or held as a slave, or sent out of the country to be so made or held. Title 18, United States Code, Section 1584; Sale into

involuntary servitude; Holding any person into involuntary
servitude or selling into any condition of involuntary
servitude, any other person for any term, or bringing within
the United States any person so held. Title 18, United
States Code, Section 1589; Forced labor, providing or
obtaining the labor or services of a person by threats of
serious harm to, or physical restraint against, that person
or another person by means of any scheme, plan, or pattern
intended to cause the person to believe that, if the person
did not perform such labor or services, that person or
another person would suffer serious harm or physical
restraint; or by means of the abuse or threatened abuse of
law or the legal process. Title 18, United States Code,
Section 1590; Trafficking with respect to peonage, slavery,
involuntary servitude, or forced labor; knowingly
recruiting, harboring, transporting, or providing, or
obtaining by any means, any person for labor or services.
Title 18, United States Code, Section 1952; travel in and
use of a facility in interstate or foreign commerce to
promote, manage, establish, carry on and facilitate the
promotion, management, establishment and carrying on of an
unlawful activity, Title 8, United States Code, Section 1324
(a)(1)(A)(i)(ii)(iii); Bringing in, smuggling, harboring,
shielding, and transporting illegal aliens. Therefore, I
respectfully request that this Honorable Court issue the
arrest warrants applied for, Title 18, United Sates Code
371; Conspiracy to commit sex trafficking namely, did
knowingly and intentionally conspire, combine, confederate
and agree, to commit offenses against the United States;
that is: to, in and affecting interstate commerce, recruit,
entice, harbor, transport, provide and obtain by any means
young Central and South American women and girls, and
benefit, financially and by receiving a thing of value, from
participation in a venture which engaged in such acts,
knowing that force, fraud and coercion, as defined in Title
18, United States Code, Sections 1591(c)(2)(A) and (B),
would be used to cause said females to engage in commercial
sex acts contrary to Title 18, United States Code 1591(a).

Lina A. Castillo
Special Agent
U.S. Immigration & Customs Enforcement

Sworn to and subscribed before me this 13th day of November, 2005

UNITED STATES MAGISTRATE JUDGE